UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Gloria Hill,                                    :      Case No. 1:13-cv-628
                                                :
       Plaintiff,                               :
                                                :
vs.                                             :
                                                :
Board of Education of the City School           :
District of the City of Cincinnati,             :
                                                :
       Defendant.                               :

**ORDER**

     Gloria Hill taught school in the Cincinnati City School District ("CPS") for thirty

years.  Following what she alleges was her constructive discharge, she filed this lawsuit

alleging claims for age discrimination and retaliation, hostile work environment, and

intentional infliction of emotional distress.  (Doc. 1)  CPS has moved for summary

judgment on a variety of grounds (Doc. 26), which Hill opposes.  (Doc. 28)

     For the following reasons, the Court will grant CPS' motion.

**FACTUAL BACKGROUND**

     Gloria Hill attended the University of Cincinnati and obtained a B.S. degree

sometime in the mid-1970's.  She received additional education at Xavier University and

the College of Mt. St. Joseph in Cincinnati.  She is certified to teach high school, with an

endorsement in English and Reading.  She began working for CPS in 1984 as a

substitute teacher, and became a regular teacher at Dater High School in 1997,

teaching English and reading.  She remained at Dater until 2012.  Hill was a member of

the Cincinnati Federation of Teachers ("CFT"), the union representing teachers in the

district.  Under the collective bargaining agreement between CPS and CFT, teachers

are evaluated at several different times, including a comprehensive evaluation performed every five years.  (Hill Dep. Ex. 16, CBA of January 11, 2011, Section 210(1)(g-l).)   All teachers in the district are subject to annual performance reviews, conducted by the principal or assistant principal of their school.  The 2011 CBA states that the parties had entered into a Memorandum of Understanding on November 3, 2010, to review and revise the Teacher Evaluation Standards ("TES"), which were the subject of ongoing discussions and negotiations.

Section 210(1)(j) of the CBA states that when a principal has concerns about an experienced teacher's performance, the principal "shall" refer the teacher to the Peer Review Panel for consideration of whether the teacher should be placed in Intervention. Intervention is part of the Peer Assistance and Evaluation Program first established in the 1985 CBA.  The 2011 contract describes the Program as one "intended to assist experienced teachers who exhibit serious deficiencies."  (Hill Dep. Ex. 16 at Section 210(2).)[1]  The Program is governed by the Peer Review Panel, consisting of an equal number of teachers appointed by CFT, and administrators appointed by the CPS Superintendent.  The Panel appoints Consulting Teachers, who work with and evaluate teachers in the Intervention program, and make recommendations to the Panel.  The Consulting Teacher shall recommend either that the teacher be released from Intervention because she met the required test scores, or that she be terminated from her position if acceptable scores are not achieved.  (Hill Dep. Ex. 3, Peer Assistance and Evaluation Program Guidelines, September 10, 2010, at Section XI(B).)   The

---

[1] There is a separate section of the program for new teachers during their first three years of teaching.

required scores are explained in Section X(C) of the Guidelines.  Scores of 3 or higher

in each "Domain" allows the teacher to remain in her teaching position and be released

from the Program; the Panel may, however, choose to keep the teacher in the Program

for an additional year of evaluation.  A score of 1 or 2 in any Domain results in either an

additional year on intervention or termination.   A "Domain" is one of four broad areas of

evaluation, and within each "Domain" are a list of specific "indicators" used to measure

and evaluate performance in that area.  Domain 1 is apparently titled "Planning and

Preparing for Student Learning;" Domain 2, "Creating an Environment for Learning;"

Domain 3, "Teaching for Learning;" and Domain 4, "Professionalism."  (Beirne Dep. Ex.

1, at CM/ECF PAGEID 1567-1568.)  The CBA specifically states that teachers who are

placed in the Intervention program are expected to cooperate with the process.

Stephen Sippel became the principal at Dater at the start of the 2009 school

year, and Anthony Gaines became the assistant principal at the same time.  Prior to

Sippel's arrival, Hill had received satisfactory performance reviews.  Sometime during

that year, Sippel observed Hill's teaching performance and identified weaknesses in her

performance in three indicators within Domains 2 and 3.  (The documentation of this

review is apparently not in the record, but the results are described in Exhibit 15 to Hill's

deposition.)  The record apparently does not contain Hill's 2010-2011 evaluation.  On

March 8, 2012, Anthony Gaines conducted her annual observation, which is a

classroom visit by the principal or his designee, to assess a teacher's performance in

class.  Gaines completed a form indicating that Hill's performance in eight indicators of

Domains 2 and 3 were either at a "basic" or "unsatisfactory" level.  (Hill Dep. Ex. 4)  On

March 12, Gaines completed an annual observation "Conference Sheet" to document

-3-

his observations.  The end of this form states that Hill "has not acknowledged this observation."  (Hill Dep. Ex. 5)  Hill did not agree with Gaines' observations, and during a conference between them on March 19, she expressed her disagreement to Gaines.  (Hill Dep. Ex. 6)  Gaines told Hill that he would be making a second classroom visit in ten days, and if she was not at the "proficient" level at that time she would be referred to the Intervention program.  Hill sent an email to a CFT representative, Kendra Phelps, asking Phelps if she could refuse to meet with Gaines again without a union representative being present.  Hill told Phelps: "I told [Gaines] that I did not trust him and I would like to know if I can meet with you ... to discuss this matter."  (Hill Dep. Ex. 7)

Gaines returned to Hill's classroom on April 20 for a "formal classroom observation for Intervention Investigation."  (Hill Dep. Ex. 8)  Gaines rated her skills as "basic" in two out of three indicators in Domain 2, and four out of five indicators in Domain 3.  She received "proficient" scores for one indicator in each Domain (2.1, creating "an inclusive and caring environment in which each individual is respected and value;" and 3.2, demonstrating "content knowledge by using content specific instructional strategies.")  Gaines attached a "script" of his observations during the approximately 50 minutes he observed Hill's classroom.  He also completed an observation conference sheet the same day, including his recommendation that Hill be referred to the Intervention Program.  Hill wrote on the form, "I have seen it but don't agree."  (Hill Dep. Ex. 9)  On April 23, Gaines wrote to the Peer Review Program Manager (Julie Indalecio) to formally recommend Hill for Intervention.  (Hill Dep. Ex. 10)  Hill wrote a "rebuttal" to Gaines' referral and his observations of her classroom on April

-4-

30, 2012.  (Hill Dep. Ex. 11)  It is unclear if she provided this document to anyone at that time, but her rebuttal states that she disagreed with Gaines' "script" of the classroom, and with his conclusions about her deficiencies.

The Peer Review Panel notified Hill on May 7 that it had assigned James Beirne, the Panel's Consulting Teacher for English and language arts, to gather information, observe Hill's classroom, and recommend to the Panel whether or not Hill should be assigned to the Intervention Program.  (Hill Dep. Ex. 12)  Hill had not met Beirne before this assignment.  On May 10, Hill sent an email to Gaines and her union representative, asking Gaines if he would consider "rescinding my earlier request of intervention.  As stated before, I would like to retire in 2013.  Please respond in kind ASAP."  (Hill Dep. Ex. 13)  Gaines did not respond to her email.  Beirne proceeded with his investigation by interviewing Gaines and Hill, and observed Hill in three of her classes on May 17 and 18.  Beirne prepared a written investigation report and recommendation to the Peer Review Panel that Hill be placed in Intervention.  In his report, he explained his observations and concerns about her classroom performance.  (Hill Dep. Ex. 15)  After considering the report, the Panel voted unanimously to place Hill in the Intervention program for the 2012-2013 school year, and notified Hill of its decision in a memorandum dated May 29, 2012.  (Hill Dep. Ex. 14)   Hill testified that she did a good job when Gaines and Beirne visited her classroom, and that Beirne was "a stickler on little things ..., just nitpicking, just trying to find something negative."  (Hill Dep. at 36)

Sometime in the summer of 2012, Hill applied for a transfer to another CPS school called "A2E" or "A2S," Alternative to Expulsion/Suspension.  CPS students are sent to this school when they are suspended from their regular school for rule or

behavior violations. She testified that her transfer request was approved by Sippel and the principal of A2E, but when she arrived at the new school at the start of the year, "... Mr. Beirne followed me over to that facility still evaluating me." (Id. at 37) Hill apparently thought that Beirne would not continue with the Intervention after she transferred. (Id. at 106) Hill sent an email to Sippel on September 7, 2012 and asked him to rescind the Intervention; she claimed that Sippel knew she "is a good teacher and I have been a very good teacher under your supervision ...". (Hill Dep. Ex. 19) Hill also exchanged several emails with Beirne in early September, when Beirne was trying to communicate with her about appointments to visit with her at the A2E/S school. (Hill Dep. Ex. 20) Hill expressed her displeasure at being placed in Intervention, both to Beirne and to others at CPS. When Beirne asked if they could meet on September 28, she responded by telling him that she filed a grievance with CFT to have the Intervention process stopped. (Hill Dep. Ex. 21) She also completed a form to report "Workplace Harassment" (Hill Dep. Ex. 24), asserting that Intervention was not fair to her, and that Beirne did not have her interests in mind and simply wanted to fire her. She asked CFT representative Jaspers if Beirne could be removed as her Consulting teacher; Jaspers responded that he had not known of teachers being able to change their assigned evaluators, and suggested that Hill contact the Peer Review Panel. (Id. Ex 25) There is no evidence that Hill took Jaspers' suggestion.

After a visit to Hill's classroom on October 11, 2012, Beirne sent Hill an email stating that "Classroom management is obviously a big issue at A2S/A2E. It is also the major issue that we discussed after my first informal observation. We cannot require it, but I strongly suggest that you attend the Effective Classroom Management course that

the district has set up."  Hill responded, "Just as I thought you don't understand the complexity of this school.  Meaning how it functions.  This is not a traditional setting and I don't feel like I need to take a management class without the whole building having to do the same.  You come looking for blame.  Like I said earlier you are not trying to help me at all.  I don't want to speak to you again!"  (Id. Ex. 26)  The tenor of their communications did not improve over the next several months, as reflected in the email exchanges between them.  (Hill Dep. Exs. 27-31)  In his declaration, Beirne explains that one of his duties as a Consulting teacher is to document the support he provides to teachers on Intervention.  Beirne kept a log entitled "Record of Assistance" that records his offers of support and assistance to Hill, as well as some of her email responses to him which often rejected his offers and his suggestions.  (Doc. 26, Ex. 2, Beirne Decl. at ¶11 and Ex. A)

Beirne further states that he met monthly with the Peer Review Panel to report on Hill's progress on Intervention, and he prepared two written interim reports in December 2012 and February 2013.  On December 14, 2012, Beirne sent Hill the December interim report, and told Hill that he was required to send a copy to her principal.  Hill responded by questioning why he sent a copy to the A2E/S principal (Ms. Smith), because "[s]he was not responsible for what you did in placing me in this mess and following me as you are doing.  I don't like you as a consulting teacher, I should not be in this mess, win or lose I don't care."  (Hill Dep. Ex. 31)  Beirne's first interim report cited several areas where Hill's performance met requirements, but a longer list of areas in which deficiencies existed.  (Id. Ex. 32)

Beirne asked Hill if they could meet on January 24 for a conference following one

of his classroom observation visits; Hill responded, "I still do not understand.  Also, what is the purpose of your visitations I know that you are aware of my retirement." (Id. Ex. 38)   Hill testified that she had planned to retire in 2012, but then she was involved in an auto accident in 2010 that injured her shoulder and required surgery.  She decided to postpone her retirement to 2013.  When she was referred to the Intervention program, she was upset by it in part because she had already planned to retire on June 1, 2013. (Hill Dep. at 25)  She also turned down the possibility of becoming the CFT's building representative for the A2E/S school because she knew she would be leaving at the end of the year.  (Id. at 130)   Beirne submitted his second interim status report on February 15, 2013, where he informed the Panel that he found Hill's teaching performance was deficient in three out of four Domains.  (Hill Dep. Ex. 33)

On March 7, 2013, Hill signed a document entitled "Separation from Service Form," stating that she was retiring and electing to take disability leave beginning March 13, 2013 to the end of the school year.  (Hill Dep. Ex. 34)   Her principal, Ms. Smith, signed the form on March 11, 2013.  The Peer Review Panel wrote to Hill on March 22, 2013, to inform her that the Panel had recommended by a vote of 8-0 that her contract be terminated for the 2013-2014 school year, and that she had until March 29 to appeal the decision under the Peer Review Program guidelines. Hill could also file a grievance under the CBA to final, binding arbitration.  And CPS argues that Ohio law provided her with the right to challenge her termination as lacking "good and just cause" by seeking a hearing.  See Ohio Rev. Code 3319.16.  She did not pursue any of these options.

While she was at the A2S/E school, Hill filed an EEOC claim on November 2, 2012, claiming that she was being discriminated against based on her age when she

was referred to the Intervention program. (Hill Dep. Ex. 22) She claimed that Sippel had removed or forced to retire at least five other teachers based on their age, and that he discriminated against her by referring her for Intervention. She asserted that the Intervention program adversely altered the terms and conditions of her employment, and that there was no legitimate business reason for it. The EEOC issued a notice of right to sue on June 10, 2013, and Hill timely filed her complaint in this case on September 9, 2013.

In Count One, Hill alleges that placing her in the intervention program was due solely to her age; that it created a hostile work environment; and that she was constructively discharged, all in violation of Ohio Rev. Code 4112.02. Count Two alleges a state law retaliation claim, alleging that CPS retaliated against her based on her age by "assigning another teacher to shadow [Hill's] daily movement in her job performance." (Doc. 1 at 3) Count Three is a common law claim for intentional infliction of emotional distress, alleging that CPS' conduct in placing her in Intervention was willful, malicious, and in reckless disregard for her rights. Count Four alleges age discrimination and hostile work environment, and Count Five alleges retaliation, both under Title VII.

## DISCUSSION

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits,

admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.  Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir. 2002).  Once that occurs, the party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," and must make an affirmative showing with proper evidence in order to defeat the motion.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court must construe the record in the light most favorable to the non-movant, and draw all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at

250.  "If the evidence is merely colorable, ...  or is not significantly probative, ... the court

may grant judgment."  <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

<u>Age Discrimination and Retaliation Claims</u>

CPS first argues that Hill failed to administratively exhaust her federal retaliation

claim, and therefore it must be dismissed.  Hill's EEOC charge does not mention

retaliation.  Both Title VII and the Age Discrimination in Employment Act require that any

claim must be filed with the EEOC no later than 300 days after the alleged

discriminatory or retaliatory act.  42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(B).

Hill's opposition memorandum does not dispute this argument.  The Court concludes

that her federal retaliation claim is clearly time-barred, and will be dismissed on that

basis.

CPS also argues that Hill's state law age discrimination and retaliation claims are

barred by the applicable Ohio statute of limitations.  Ohio Rev. Code 4112.02(N) states

that such a claim must be filed within 180 days after the unlawful discriminatory act

occurred.  Hill's lawsuit was filed on September 9, 2013, and CPS contends that any act

prior to March 13, 2013 is time-barred.  Hill relies on her allegation that she was

constructively discharged in asserting her state law claims, and CPS argues that her

voluntary retirement and separation from employment on March 7, 2013 started the

180-day period.  CPS cites <u>Mayo v. Kenwood Country Club, Inc.</u>, 166 F.3d 1214, at *2

(6th Cir. 1998)(unpublished), where the court held that an employee bringing a

constructive discharge claim "effectively determines when he or she is constructively

discharged by resigning.  Therefore, we conclude that in a constructive discharge the

limitation period begins when the employee resigns, not the final day of employment."  A

-11-

similar result was reached in <u>Diepenhorst v. City of Battle Creek</u>, 2007 U.S. Dist. LEXIS
28200, at *9-10 (W.D. Mich. Apr. 17, 2007), aff'd 282 Fed. Appx. 412 (6th Cir. 2008),
where the district court held that a plaintiff's limitations period started on the day she
gave notice of her resignation, even though she was paid accrued vacation and comp
time for two weeks thereafter.

Hill argues that she simply "applied" for disability retirement on March 7 and
went on medical leave, but CPS kept her in the Intervention program until her formal
retirement date of June 1, 2013. The Separation form Hill signed on March 7, 2013 (Hill
Dep. Ex. 34) states that she requested "unassigned" status using her accumulated sick
leave beginning on March 13, 2013. And in her letter to Beirne dated March 26, 2013,
she again stated that she had been "retired since March 13, 2013." (Hill Dep. Ex. 35)
She does not dispute the fact that she voluntarily submitted her notice of separation
from her employment on March 7, and she acknowledges that she did not return to work
after that date. The cases cited above, and other authorities discussed therein, are
clear that a plaintiff alleging constructive discharge must bring her claim within the
applicable limitations period measured from the date that she resigns or separates from
employment. Hill did so on March 7, 2013, and her complaint was filed more than 180
days after that date.

CPS next argues that Hill's state law claims are also barred by Ohio Rev. Code
4117.10, which states that if a collective bargaining agreement provides for final and
binding arbitration of grievances, "... public employers, employees, and employee
organizations are subject solely to that grievance procedure." Hill failed to pursue a
grievance under the CBA after she was placed in the Intervention program; and the

Peer Review Guidelines and the CBA both provide avenues to challenge any ultimate decision reached by the Panel.  Since she failed to pursue her contractual remedies, CPS contends that her claims should be dismissed.  CPS cites Chenevey v. Greater Cleveland Reg'l Transit Auth., 2013-Ohio-1902 (8th Dist. App. 2013), where plaintiff alleged age and reverse race discrimination claims under O.R.C. 4112.02  after he was not promoted to sergeant.  He alleged that his placement on a promotional eligibility list, created under terms of the CBA between plaintiff's union and the employer, entitled him to that promotion; when two younger, African-American officers were promoted instead of him, he resigned and brought a lawsuit.  He argued that because he brought statutory claims, he need not pursue the grievance and arbitration provisions contained in the CBA.  The Ohio court of appeals disagreed, finding that his claims arose from and depended upon an interpretation of the collective bargaining rights guaranteed by the CBA.  O.R.C. 4117.10 states that in such cases, the remedies provided by contract are exclusive and the courts lack subject matter jurisdiction.

Hill responds that this case is inapposite to her situation because it involved reverse race discrimination.  She contends that CPS sought to illegally force older Dater teachers into retirement by offering them an incentive bonus, and then "forcing" them into the Intervention program if they chose not to retire.  She argues that the adverse employment action was her "unjustified" poor evaluation by Gaines, which resulted in her forced retirement.

The Court cannot discern a meaningful difference between the facts at issue in Chenevey, and the facts giving rise to Hill's claims.  Section 210 of the governing CBA between the CFT and CPS established the Peer Assistance and Evaluation Program.

The Grievance Procedure contained in Section 300 states that a "grievance" is a complaint about a violation, misinterpretation or misapplication of "any provision(s)" of the CBA. The procedure for resolving grievances includes three levels, culminating in final and binding arbitration. Hill admits that she attempted to file a grievance with CFT but could not recall when she filed it. CPS notes that she sent an email to Jaspers on October 1, 2012, telling Jaspers that she sent a grievance to stop the Intervention, but Jaspers told her it was too late. (The CBA requires grievances to be filed within 15 days of the event giving rise to the grievance.) The Ohio courts have consistently held that Ohio Rev. Code 4117.10 does not permit a private cause of action if the claim arises under a CBA. The genesis of Hill's claims is the fact that she was referred to the Peer Review Panel and placed in Intervention; both of these acts arose under the CBA, and Hill should have timely pursued a grievance in order to challenge them.

However, even assuming that Hill's state law discrimination claims were timely filed and are not barred by O.R.C. 4117.10, the analysis of her state claims would proceed under the same framework as her federal claims, which are timely. See Coryell v. Bank One Trust Co. N.A., 101 Ohio St.3d 175, 803 N.E.2d 781, 785 (Ohio 2004). Hill does not offer direct evidence of age discrimination, and relies on circumstantial evidence. A prima facie case of age discrimination requires Hill to show: (1) she was at least 40 years old, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) she was replaced by a substantially younger person, or was treated less favorably than similarly-situated non-protected individuals. Geiger v. Tower Automotive, 579 F.3d 614, 622 (6th Cir. 2009). To establish a prima facie retaliation claim, Hill must show that (1) she engaged in protected activity; (2) CPS

knew of that activity; (3) she suffered an adverse employment action; and (4) a causal

connection exists between her activity and the adverse action.  Upshaw v. Ford Motor

Co., 576 F.3d 576, 588 (6th Cir. 2009).

CPS argues that Hill did not suffer an adverse employment action.  The

placement of an employee on a performance improvement plan, or subjecting an

employee to heightened levels of scrutiny, is not considered to be an adverse action.  In

order to satisfy this prong, an action must create a **materially** adverse change in the

terms and conditions of a plaintiff's employment.  See, e.g., Agnew v. BASF Corp., 286

F.3d 307, 310-311 (6th Cir. 2002); Bagby v. Covidien, 2014 U.S. Dist. LEXIS 34497,

**29-30 (S.D. Ohio, Mar. 17, 2014); Allen v. Ohio Dep't of Jobs & Family Servs., 697

F.Supp.2d 854, 891 (S.D. Ohio 2010)  While it is quite clear from the record that Hill

disagreed with and disliked the Intervention program, her unhappiness about and

resentment of that program do not transform it into an "adverse" action.  Hill cites White

v. Baxter Healthcare Corp., 533 F.3d 381 (6th Cir. 2008), to argue that her poor

performance evaluation constitutes an adverse employment action.  But in White,

plaintiff's poor evaluation (which he alleged was motivated by his race) directly resulted

in lower pay and loss of a bonus.  Hill has not identified any loss of benefits or salary

that resulted from her placement in the Intervention program.

Hill repeatedly contends that CPS (acting through Gaines, Sippel and/or Beirne)

wanted to "force" older teachers at Dater to retire by referring them to the Peer Review

Panel.  She offers hearsay testimony from CFT's Dater building representative, Ms.

Wessel, about complaints from other teachers concerning evaluations they received

from Gaines or Sippel.  Hearsay evidence is not admissible for purposes of opposing

-15-

summary judgment.  Jacklyn v. Schering-Plough Healthcare, 176 F.3d 921, 926 (6th Cir. 1999).  Wessel also believes that Gaines or Sippel wanted the older teachers to retire.  But Wessel's opinion is simply her own subjective belief, and does not show that Hill suffered an adverse employment action.  Similarly, Hill testified about "discussions" and "talk" she heard in the teacher's workroom at Dater, that older teachers were unhappy with Sippel and Gaines, and felt they were being treated unfairly.  This hearsay is not  admissible evidence raising a plausible inference that Hill was deliberately "targeted" for placement in Intervention for the purpose of terminating her, and therefore subjected to an adverse action.

Hill also suggests that her transfer to the A2E school was an adverse action, because the students at that school were disruptive and in some cases violent.  Hill does not dispute that she requested the transfer from Dater to A2E, and that the principals of both schools approved her request.  The voluntary transfer cannot be considered an adverse "action" taken against her because she was the initiator of that transfer.

Hill also contends that she was constructively discharged, which has been held to be an adverse employment action.  To establish a constructive discharge, Hill must show that: (1) CPS deliberately created an intolerable working environment, as would be perceived by a reasonable person; (2) CPS created that environment with the intent of forcing Hill to resign; and (3) Hill actually resigned.  The Court should consider both CPS' intent and Hill's objective feelings.  Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999).  The Court rejects Hill's contention that placing her on the Intervention program, or Beirne's consulting and oversight of her classroom

performance, created an objectively "intolerable" working environment such that her decision to retire amounted to a constructive discharge.  Such an environment was present in Moore v. KUKA, where plaintiff was the only African-American in a welding shop that had 15-20 employees.  It was undisputed that he was frequently subjected to numerous racial slurs and jokes on the shop floor, behavior that was tolerated to some extent by the employer.  Racial slurs were written on a bathroom wall, and at least one fellow employee used the "n" word frequently in racially tinged jokes.  On at least one occasion, the "joke" was specifically directed to plaintiff.  His supervisor was present when this happened but took no action against the coworker.  His supervisor also asked him to drive a white coworker in his car, and told the coworker to sit in the back seat.  When the plaintiff discovered that a new employee who he had trained was paid more than he was, he complained to the plant manager and his supervisor about his wages and the frequent use of "race words" in the plant.

Plaintiff filed an EEOC claim shortly thereafter.  A couple of weeks later, his supervisor and coworkers began avoiding him and would not speak to him; the supervisor told other employees to move their tools away from plaintiff's work station; two employees were removed from his department, leaving him the sole employee.  After fifteen months of this isolation, plaintiff quit his job and brought a lawsuit alleging discrimination, hostile environment and constructive discharge.  On appeal from a jury verdict in favor of plaintiff, the employer argued that the evidence did not support a constructive discharge.  The Sixth Circuit disagreed, finding that:  "Day after day, week after week of isolation on the job and lack of communication would lead him to believe that he was no longer wanted and would continue to receive the cold shoulder as long

as he worked there." Id. at 1080-1081.

Here, Hill believes that referring her to the Intervention program, or Beirne's consistent attempts to engage her in the consultation process, created an objectively intolerable working environment that forced her to quit, or created an actionable hostile environment. The Court must conclude that nothing in the record suggests that is the case. Beirne's email communications with Hill (which she often rebuffed) included offers of assistance, suggestions for additional training, places to obtain free books for her students, requests that Hill read and respond to his emails, and other suggestions for successful participation in the program. There is nothing in his written communications that suggests hostility, animosity, or age bias. Hill argues that Beirne did not understand the environment of the A2E/S school, and that his consultation was therefore inappropriate and objectively intolerable. Her evident disagreement with Beirne's observations and suggestions do not raise a genuine factual dispute that the Intervention program was so **objectively** intolerable that Hill could show she was constructively discharged, or was required to endure a "hostile" work environment. Moreover, Hill testified that she was upset when she was initially referred to the Peer Review Panel in 2012 because she was planning on retiring in June 2013. Her admission that she had planned to retire before the Intervention referral occurred further supports the conclusion that she was not constructively discharged. Her prima facie discrimination claim fails in the absence of showing an adverse action.

Hill has also failed to establish a prima facie retaliation claim. She has not shown that she suffered an adverse action, and has no evidence that anyone at CPS knew that she had engaged in protected activity. She believes that she told someone at her union

-18-

that she had consulted with an attorney sometime in 2012.  But there is absolutely no evidence or testimony that anyone at CPS was aware of that.  Hill has not identified any other protected activity she engaged in that she believes led to Gaines' evaluation and subsequent referral to the Intervention program.  Her retaliation claim fails at the prima facie stage for that reason.

Even if Hill could establish a prima facie claim, CPS argues that she cannot show that CPS' reasons for placing her in the Intervention program are a pretext for age discrimination.  Hill claims that older teachers were offered an early retirement buy-out, and those who declined that offer were placed in the Intervention program.  The early retirement incentive offer was a benefit specifically negotiated between CPS and the CFT, and was included in the January 2011 CBA.  (See Doc. 34, Ex. 2, McDole Declaration.)  The ADEA includes a specific safe harbor for such incentive programs. See 29 U.S.C. §623(f)(2)(B)(ii): "It shall not be unlawful for an employer ... to observe the terms of a bona fide employee benefit plan that is a voluntary early retirement incentive plan consistent with the relevant purpose..." of the ADEA.  The fact that CPS offered this buy-out to all eligible teachers (including those at Dater) is not evidence of discriminatory conduct.  Hill argues that only those who declined the buy-out were subjected to increased levels of scrutiny and placed in the Intervention program.  But aside from her own belief that this is the case, she offers no admissible evidence supporting this argument.

Hill also asserts that the Intervention program is designed to result in the termination of older teachers.  She relies on Beirne's testimony; he was asked if any of the teachers he worked with in the Program had successfully completed it, and he said

no.  (Beirne Dep. at 237)  Beirne testified that he had personally been assigned three teachers to follow in Intervention (including Hill). Beirne is not the only consulting teacher in the Peer Review program.  Beirne states in his declaration that for the three school years from 2010 through 2013, a total of 22 teachers in the CPS system were assigned to the Intervention program by the Peer Review Panel, and 12 of them successfully completed the program and continued with CPS.  (Doc. 34, Ex. 1) Hill does not dispute this evidence, which contradicts any assertion that the Intervention program is designed to "get rid" of older teachers.

Hill further relies on the testimony of Carolyn Clayton, another Dater teacher who received a negative evaluation from Gaines after she received an excellent review the previous year.  Clayton testified that she believed Gaines was trying to force her to retire, and even asked her at one point if she knew about the early retirement bonus program.  (Clayton retired from CPS on June 1, 2013, more than two years after Gaines conducted her February 2011 evaluation.)  The Supreme Court has held that there is no per-se rule that testimony from non-party co-workers about alleged discriminatory treatment is inadmissible.  The court should consider such evidence under Fed. R. Evid. 401 and 403 to determine its logical relevance, probative value and potential prejudicial effect.  Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 386-387 (2008).  The Sixth Circuit has cautioned, however, that such evidence is at best marginally relevant to a plaintiff's claims, and is always prejudicial to a defendant.  Schrand v. Fed. Pac. Elec. Co., 851 F.2d 152, 156 (6th Cir. 1988).  Hill stresses that Clayton was a senior English teacher at Dater, who had almost 30 years of teaching experience and received a negative performance review from Gaines.  But that fact alone does not make

-20-

Clayton's testimony probative.  Gaines' observations about Clayton's performance differed from those he noted on Hill's evaluation; and Clayton was not referred to the Peer Review Panel.  Moreover, Hill does not dispute the fact that Gaines (or Sippel) lack the authority to place a teacher into the Intervention program.  A principal must refer the matter to the Peer Review Panel, who then appoints a consulting teacher to observe and make recommendations to the Panel. It is the Panel that has the final authority on whether or not to accept a consultant's  recommendations.  Gaines' discussions with Clayton and his negative observations do not give rise a reasonable dispute that CPS's reasons for placing Hill in the Intervention program were simply a subterfuge for age discrimination.

The Court concludes that the record fails to establish a genuine factual dispute about pretext, and that Hill's age discrimination and retaliations claims fail on that basis as well.

<u>Intentional Infliction of Emotional Distress</u>

Finally, CPS argues that Hill's claim for intentional infliction of emotional distress should be dismissed.  This claim is based upon the same events and incidents that support her age discrimination and retaliation claim: the negative performance evaluation, placement in the Intervention program, and Beirne's consulting work while she was on intervention.

In order to establish a claim for intentional infliction of emotional distress under Ohio law, Hill must show: "(1) that the defendant either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress; (2) that the defendant's conduct was so extreme and outrageous as

to go beyond all possible bounds of decency and was such that it would be considered

utterly intolerable in a civilized community; (3) that the defendant's actions were the

proximate cause of plaintiff's psychic injury; and (4) that the mental distress suffered by

plaintiff is serious and of such a nature that no reasonable person could be expected to

endure it." Smith v. Redecker, 2010-Ohio-505, at ¶60 (Ohio App. 4th Dist. 2010).  Hill

contends that CPS acted maliciously and intended to cause her emotional distress, and

that its conduct should be considered "utterly intolerable."  She has filed a report of a

consulting psychologist who performed an evaluation of her in September 2014 (and

who states that he conducted this evaluation in two telephone conversations).  Dr.

Paugh opines that Hill has a Generalized Anxiety Disorder that he believes arose after

the events at CPS.  He believes that her situation during her last year at CPS was quite

stressful to her.  (Doc. 28, Ex. 1 at 9-10)

   The Court must reject Hill's claim.  The Court has already concluded that her

discrimination, retaliation and hostile work environment claims lack merit.  The facts

giving rise to those claims do not amount to conduct that is "beyond all bounds of

decency."  It is obvious from the record that Hill resented the referral to the Peer Review

Panel, the Panel's decision to place her in Intervention, and Beirne's involvement in

observing her and offering suggestions and comments.  She clearly disliked the

Intervention program, and complained when her transfer to another school did not result

in terminating her from that program.  But all of these actions simply do not rise to the

level of extreme and outrageous conduct that might support a claim for intentional

infliction of emotional distress.  The evaluation process and the Peer Review Panel

were negotiated subjects included in the CBA between Hill's union and CPS.  The

referral of a teacher to that program cannot be labeled as intolerable behavior.  The Court finds that CPS is entitled to summary judgment on this claim as well as the rest of Hill's complaint.

## CONCLUSION

For all of the foregoing reasons, the Court grants Defendant's motion for summary judgment (Doc. 26).  Plaintiff's complaint and each cause of action alleged therein is dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: June 23, 2015                    s/Sandra S. Beckwith
                                        Sandra S. Beckwith, Senior Judge
                                        United States District Court